IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    )
                                    )
v.                                  )      No. 3:08-CR-147
                                    )      (JORDAN/SHIRLEY)
ANTHONY CORNELIUS BAYLIS,           )
                                    )
              Defendant.            )

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the district court as

may be appropriate.  This criminal action came before the Court on December 2, 2008, for a hearing

on defendant Anthony Baylis' ("Defendant") Motion to Suppress Evidence [Doc. 8] and Motion to

Suppress Statement.  [Doc. 10]  Assistant United States Attorney Cynthia Davidson was present

representing the government.  Attorney Boyd Venable III was present representing Defendant, who

was also present.  After the hearing, the Court directed the parties to file post hearing briefs.

Defendant filed his briefs [Docs. 19, 20] on December 10, 2008, the government filed its post

hearing briefs [Doc. 22] on December 17, 2008, and the matter is now ripe for adjudication.

Defendant moves the Court to suppress all evidence, including any statements by Defendant,

obtained by law enforcement officers during the April 4, 2008, execution of a search warrant and

the subsequent arrest of Defendant.  Defendant contends that the warrant was not supported by

probable cause, that the reliability of the government's confidential informant was not established,

1

that there was no nexus between the residence to be searched and the contraband and criminal activity described in the warrant, that there are misrepresentations in the warrant, and that any statements made by Defendant were obtained without the requisite Miranda warnings. The government disagrees, arguing that the warrant was valid and supported by probable cause and that Defendant's statements fall within the public safety exception, and thus Miranda warnings were not required. The government further argues that, even if the warrant were flawed, the good faith exception applies to preserve any evidence recovered. The Court notes that, initially, the government also raised the issue of standing, arguing that Defendant lacked the standing necessary to challenge the search at issue. However, after the hearing, both parties agreed that Defendant does have the standing necessary to bring the instant motions. Accordingly, the Court need not address the standing issue.

## I.    SUMMARY OF TESTIMONY

### A.    Testimony of Josh West

The government called as its first witness Josh West ("Officer West"), who, at the time in question, was a police officer for the City of Oak Ridge, and more specifically, a member of the Oak Ridge Police Department ("ORPD") SWAT team. [Tr. 4-5][1] Officer West testified that he was involved in the April 4, 2008, execution of a search warrant ("the Warrant") at 130 South Walker Lane ("the Residence"), and that there were approximately ten to eleven officers involved in the execution of the Warrant. [Id.] Officer West stated that the officers conducted a planning meeting prior to the execution of the Warrant, and that at that meeting, the officers were told that they would

---

[1]All citations to the transcript [Doc. 24] of the December 2, 2008 hearing are denoted by [Tr. ] and the appropriate page number or numbers.

be looking for drugs, that individuals at the Residence might be armed, and that the Residence had recently been the location of a home invasion, in which someone had been shot. [Tr. 5] Officer West indicated that he could not recall what time the Warrant was executed, but that it was nighttime and dark outside. [Tr. 6]

Officer West testified that upon arriving at the Residence, a fellow officer, Officer Yook, knocked on the door of the Residence, yelled "Police, search warrant", knocked a second time, again yelled "Police, search warrant", and then forced the door open. [Id.] Officer West stated that Officer Yook was the first officer to enter the house, and that Officer West was the second officer to enter. [Id.] Officer West testified that upon entering, Officer Yook encountered Melissa McBee (Ms. McBee") and was "dealing with her," while at the same time Officer West went to the room immediately to his left. [Id.] Officer West stated that the door to the room, which was approximately four to five feet away from the front door to the Residence, was closed and locked, but that he could see that the lights were on in the room, so he forced the door open. [Tr. 6-8] Officer West testified that he did not announce himself before entering this door, but instead just forced it open. [Tr. 7]

Officer West indicated that upon forcing the door and entering the room, he observed an individual, whom the officer identified as Defendant, standing in front of a dresser. [Tr. 8-9] Officer West testified that when going through a house while executing a warrant, he constantly announces "Police, search warrant", and that when he entered the room, he ordered Defendant to get on the ground. [Tr. 8] Officer West stated that Defendant complied, at which point the officer placed Defendant in handcuffs and asked Defendant if he had any weapons on him. [Id.] Officer West indicated that Defendant stated that he had a gun in his pocket, that no gun was actually found

in Defendant's pocket, but that a loaded gun was found on the floor in front of the dresser. [Id.] Officer West testified that he believed that there were approximately six to eight other people, not including officers, in the Residence, including children. [Tr. 8-9, 12] Officer West remained in the room with Defendant for several minutes, until other officers arrived. [Tr. 8-9]

On cross-examination, Officer West testified that he encountered Defendant in the first bedroom on the left, and that the officer went straight to that room upon entering the Residence. [Tr. 9-10] Officer West reiterated that Defendant did not have a gun on his person, but that one was found nearby. [Tr. 10] Officer West stated that when he handcuffed Defendant, he did not tell Defendant that he was under arrest, but agreed that Defendant was not free to go. [Id.] Officer West agreed that it was after handcuffing Defendant that the officer asked Defendant whether he had a gun, and that Defendant responded that he had a gun in his pocket, though no gun was actually found in Defendant's pocket. [Tr. 10-11] Officer West indicated that he did not find a holster for the gun. [Tr. 11]

Officer West testified that he remained in the room for the first several minutes of the Warrant execution, so he did not know what was occurring in the rest of the Residence during that time. [Id.] Officer West stated that he and Defendant were the only people in the room when the officer first encountered Defendant. [Id.] Officer West indicated that he did not read Defendant his Miranda rights, that the officer did not remove the handcuffs from Defendant, and that the officer did not observe anyone else Mirandize Defendant. [Id.] Officer West agreed that Defendant was not free to leave at any point after being told to lay down and was handcuffed. [Tr. 12]

Officer West stated that Ms. McBee was the owner of the Residence. [Id.] Officer West testified that Officer Yook detained Ms. McBee when the officers began executing the Warrant, but

Officer West was not certain if Ms. McBee was arrested or otherwise charged with any crime. [Id.] Officer West indicated that he did not know who Defendant was when the officer detained him. [Id.] Officer West testified that the officers executing the Warrant were advised as to the names of individuals expected to be at the Residence, but that he could not place names to faces, and that he could not remember the names provided at that time. [Tr. 13]

On redirect, Officer West testified that it was only a matter of seconds after entering the room that the officer handcuffed Defendant, and that the officer immediately asked Defendant if Defendant had any guns. [Id.] Officer West stated that he asked Defendant if he had any guns as a matter of safety, both officer safety and general safety. [Id.]

**B.    Testimony of Allen Marvell Moore**

The government next called Allen Marvell Moore ("Officer Moore"), an investigator with the ORPD. [Tr. 15] Officer Moore testified that he had been assigned to Narcotics since March 2008, and had been with the ORPD since January 2006. [Id.]  Officer Moore stated that prior to coming to the ORPD, he worked with the Chattanooga Police Department, and worked for Wackenhut for approximately two years, for a total of about seven years of law enforcement experience. [Id.]

Officer Moore testified that, while working at the ORPD, he initiated an investigation into the sale of crack cocaine at the Residence. [Id.] Officer Moore testified that approximately two weeks prior to being assigned to Narcotics, he encountered an individual (the "CI") during a traffic stop who offered to act as a confidential informant. [Tr. 16] Officer Moore indicated the CI told the officer that the CI had previously worked with the Harriman city police, the Roane County Sheriff's Department, and the TBI. [Tr. 18] Officer Moore testified that he confirmed what the CI

5

told him, and confirmed that the CI was involved in other pending investigations with the ORPD. [Tr. 18-19] Officer Moore stated that the CI told the officer that the CI was aware of several locations in Oak Ridge where narcotics could be purchased, including the Residence. [Tr. 19]

Officer Moore testified that the CI knew an individual, referred to as the letter "C", at the Residence, from whom the CI could purchase drugs. [Id.] Officer Moore stated that he began working the CI, and arranged for the CI to make controlled buys from C. [Tr. 19-20] Officer Moore indicated that he ran the tags associated with C's vehicle, and the vehicle came back as being registered to Trevelle Baylis, Defendant's brother. [Tr. 20] Officer Moore testified that the CI later identified C as Trevelle Baylis through a photo lineup. [Id.]

Officer Moore stated that the CI made three controlled buys from Trevelle Baylis at the Residence, and a fourth buy from Trevelle Baylis at the parking lot of the Doubletree Hotel. [Id.] Officer Moore testified that the three buys at the Residence were tape recorded, and that all three occurred within one month of the April 4, 2008, Warrant execution, with the last purchase occurring within forty-eight hours prior to the Warrant execution. [Tr. 21]

Officer Moore described the controlled buy process as follows: the officer would meet with the CI at an undisclosed location, at which point the CI and the CI's vehicle are checked for any illegal substances or weapons; the CI is equipped with a monitoring device to record the transaction; the CI is given pre-recorded funds for the purchase; the CI is then monitored from the moment the CI leaves to conduct the transaction, is monitored while entering and exiting the location, and then monitored while traveling back to the location where the officer met with the CI prior to the transaction; upon returning, the CI and the CI's vehicle are again searched, the CI is debriefed, and the evidence, including any recordings, are secured. [Tr. 21-22]

6

Officer Moore was then shown a document which the officer identified as the affidavit he prepared in support of the Warrant application. [Tr. 22] Officer Moore testified that he swore to the accuracy of the affidavit and that the affidavit was true. [Id.] Officer Moore testified that the CI told him that Trevelle Baylis did not live at the Residence, but simply used the Residence to sell drugs from. [Tr. 22-23] Officer Moore indicated that the CI obtained that information from Trevelle Baylis himself, that Trevelle Baylis said that he did not live at the Residence, but that the CI should call before coming over. [Tr. 24] Officer Moore stated that Ms. McBee is the owner or renter of the Residence, and that the CI advised the officer that Ms. McBee was present during the buys and knew that Trevelle Baylis was selling drugs out of the house. [Id.] Officer Moore testified that the portion of the affidavit which indicated that Ms. McBee knew of the drug trafficking was based on what the CI had said at the time. [Tr. 25] Officer Moore testified that on September 24, 2007, there was a shooting at the Residence, and the officer believed that Trevelle Baylis was shot while at the Residence. [Id.]

Officer Moore indicated that on April 29, 2008, he testified at a bond hearing in state court regarding the events in question, and that in between the hearing date and the night of the execution of the Warrant, the officer had the opportunity to interview Ms. McBee. [Tr. 26] Officer Moore testified that, during his interview of Ms. McBee, she told the officer that she did not know that drugs were being sold at the Residence and that the drugs were not hers. [Id.] Officer Moore stated that he did not have this information when he prepared the affidavit in support of the Warrant, but only had the information from the CI to rely on. [Id.] Officer Moore testified that, after speaking with Ms. McBee, his opinion as to whether she knew about the drug activity changed, and that when he applied for the Warrant, based on the information from the CI, he believed that Ms. McBee was

aware of the drug activity, but that he no longer believed that after actually speaking with Ms. McBee. [Tr. 27] Officer Moore reiterated that the Affidavit was true based upon the information he had at the time, but that he changed his opinion as to Ms. McBee's knowledge after the fact. [Tr. 28] Officer Moore stated that he had no reason to misrepresent anything in the affidavit. [Id.]

On cross-examination, Officer Moore testified that he was present for the execution of the Warrant, and that there were approximately nine to eleven officers in the entry team. [Tr. 29] Officer Moore stated that he did not enter the Residence until after it was secured by the entry team. [Id.] Officer Moore indicated that he did not know who videotaped the execution. [Id.] Officer Moore testified that Trevelle Baylis did not live at the Residence, but that he was known to "frequent" the Residence. [Tr. 29-30] Officer Moore agreed that the affidavit indicates that Trevelle Baylis is known to "stay" at the Residence. [Tr. 30] Officer Moore stated that he did not use the word "stay" in an attempt to get the reviewing judge to sign the Warrant, but instead stated that "stay" and "frequent" were the same terminology. [Id.] Officer Moore indicated that the CI told him that Trevelle Baylis did not live at the Residence. [Id.]

Officer Moore also testified that Defendant did not live at the Residence. [Id.] Officer Moore indicated that he prepared an inventory of items that were found during the execution of the Warrant, and that the inventory indicated that several items were seized from Defendant's "bedroom". [Tr. 30-31] Officer Moore agreed that, at that point in time, he believed that the room in the Residence where Defendant was arrested was Defendant's bedroom, and that he stayed there. [Tr. 31] Officer Moore testified that he changed his mind, that he did not originally believe that Defendant stayed at the Residence, but did believe that Defendant stayed at the Residence after executing the Warrant. [Id.] Officer Moore testified that he now believed that Defendant did stay

8

at the Residence and that the room he was encountered in was Defendant's bedroom. [Tr. 32]

Officer Moore stated that he did not include in the affidavit detailed information about the CI's past work, or what agencies the CI had worked with, only that the CI had worked with different agencies. [Id.] Officer Moore testified that he did include in the affidavit some information about work the CI had done, such as that the CI had worked with the ORPD and other law enforcement agencies and that the CI was involved in ongoing investigations. [Tr. 32-33] Officer Moore indicated that he believed that he had included sufficient information about the CI in the affidavit. [Tr. 33] Officer Moore testified that he did not provide the name of the CI to the judge who issued the Warrant, nor did he provide past instances of the CI's reliability. [Id.]

Officer Moore stated that the drugs purchased by the CI from Trevelle Baylis from each of the controlled buys were tested, but that he had not provided those test results to the government to hand over to the Defendant. [Id.] Officer Moore testified that he had not provided coopies of the audio recordings of the controlled buys, either. [Id.] Officer Moore indicated that he told the judge who issued the Warrant that the CI had worked with other agencies and that the officer had followed up on the information provided by the CI. [Tr. 34] Officer Moore testified that he had no information that Trevelle Baylis stored drugs at the Residence, only that he sold drugs out of the Residence, as confirmed by the controlled buys conducted by the CI. [Tr. 34-35] Officer Moore stated that he included Trevelle Baylis' name in the affidavit because the CI had made controlled buys from Trevelle Baylis, and that his investigation revealed that drugs were being sold out of the Residence. [Tr. 36-37]

Officer Moore testified that, at the time he applied for the Warrant, he believed that Ms. McBee was aware of the drug activity in the Residence, but that after he spoke with Ms. McBee, he

changed his mind. [Tr. 37-38] Officer Moore indicated that prior to the execution of the Warrant, other than the information provided by the CI, he did not obtain any other information regarding Ms. McBee's knowledge of drug activity at the Residence or regarding whether Trevelle Baylis lived at the Residence. [Tr. 39-40] Officer Moore testified that Ms. McBee was charged with a crime, and that she pled guilty to a charge of simple possession. [Tr. 40-41]

Officer Moore indicated that two guns were found at the Residence, and that ammunition was found in the laundry room. [Tr. 41] Officer Moore confirmed that a black canvas rifle case with magazine residue was found in a hallway at the Residence. [Tr. 41] Officer Moore stated that two plastic baggies containing approximately 12.2 grams of marijuana were recovered from the toilet in the bathroom near the laundry room, and that a Taurus .38 Special revolver and a wooden box containing crack cocaine residue were found in Ms. McBee's bedroom. [Tr. 41-42] Officer Moore testified that a plastic baggy containing 0.8 grams of marijuana was found in the living room, as was a set of hanging scales. [Tr. 42]

Officer Moore testified that he could not recall how much money was found on Defendant's person. [Id.] Officer Moore stated that they found mail addressed to Defendant at the Residence, but that he did not recall the location the mail was addressed to. [Id.] Officer Moore testified that the gun at issue in this case was not found in Defendant's actual possession. [Id.] Officer Moore indicated that Ms. McBee told the officers that the room in question was Defendant's room, which is why Defendant was charged. [Tr. 42-43] Officer Moore agreed that Ms. McBee might have motive to lie. [Tr. 43] Officer Moore testified that they did not fingerprint the items seized from the Residence, but that the items were placed in the ORPD evidence storage until they could be sent to the TBI lab. [Tr. 43-44]

Officer Moore testified that when he applied for the Warrant, he had no information about Defendant's involvement in any kind of drug trafficking. [Tr. 45] Officer Moore testified that there was evidence of drug activity at the Residence, and that Ms. McBee was charged with tampering with evidence for attempting to hide evidence in this case. [Id.]

On redirect, Officer Moore reiterated that there were three controlled buys at the Residence, that the buys were recorded, and that the officer listened to the recordings. [Tr. 46] Officer Moore testified that Ms. McBee was present at the Residence during one of the buys and opened the front door. [Id.] Officer Moore indicated that the controlled buys took place inside the Residence, and that the CI went inside. [Id.]

## II.    FINDINGS OF FACT

Given that the primary issue raised by the Defendant, whether the Warrant was supported by probable cause, requires a decision based upon the four corners of the affidavit, the Court will not make separate findings of fact at this time. United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005). Rather, the Court makes specific findings of fact as needed throughout the remainder of the opinion. To do otherwise might result in confusion of the issues, as while the Court might find that an event did happen, if the event were not described in the affidavit offered in support of the Warrant, then it would not be proper for the Court to consider that fact in determining whether the affidavit supported a finding of probable cause.

## III.    POSITIONS OF THE PARTIES

The Defendant moves the Court to suppress all evidence seized as a result of the April 4, 2008, execution of the Warrant, including any statements made by Defendant during the execution of the Warrant. As grounds, the Defendant argues that Warrant was not supported by probable cause

11

because: the CI's reliability was not properly established; there was no nexus between the Residence and contraband or criminal activity; the affidavit in support of the Warrant contained material misrepresentations; Defendant was not properly Mirandized before the statements at issue; and that this case falls outside the <u>Leon</u> good faith exception. The government disagrees, arguing that: the Warrant was supported by probable cause; the reliability of the CI was properly established; there was a sufficient nexus between the Residence and criminal activity; the affidavit in support of the Warrant did not contain misrepresentations; the public safety exception excuses the absence of Miranda warnings; and that the <u>Leon</u> good faith exception serves to make up for any short comings in the affidavit.

## IV.    ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a home or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>Id.</u> at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," <u>Carroll v. United States</u>, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.

12

> Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311,
> 93 L. Ed. 1879 (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

Initially, the Court would note that the issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Gates, 462 U.S. at 238-39) (alterations in original). In addition, "a warrant application must provide sufficient information to allow an issuing judge to independently determine probable cause; his action cannot be a mere ratification of the conclusions of others." United States v. Gunter, No. 07-5277, 2009 WL 37481, at *6 (6th Cir. Jan. 8, 2009) (citing Gates, 462 U.S. at 239).

In the present case, the relevant portions of the affidavit state as follows:

> 1.    I have worked in the field of law enforcement for over 7 years
> and have worked as an officer with the Oak Ridge Police Department
> since 2006. I am currently assigned to the Investigations Division's
> Narcotics Unit as a narcotics investigator. I have received training in
> narcotics operations and narcotics trafficking and I am familiar with

13

the activities of those in illegal narcotics activity. I have used overt and covert methods of investigation, including undercover operations, issuance of subpoenas, interview/interrogation, and controlled purchases. I have participated in, organized, and initiated investigative efforts that have targeted narcotics dealers and other criminals.

2.      Within the past month, I received information from a confidential informant (CI) that Trevelle Baylis is selling crack cocaine at 130 S. Walker Ln., Oak Ridge, Anderson County, Tennessee. According to the CI, Baylis does not live at the residence, but frequents and uses the residence as a location to sell crack cocaine with permission of the resident, Melissa McBee.

3.      This CI has provided services and information in the past to the Oak Ridge Police Department and other area law enforcement agencies. This CI is involved in other pending and on-going narcotics investigations. I have been able to prove that this CI's information is reliable and credible.

4.      This CI, working with me, has been inside 130 S. Walker Ln. and has made controlled purchases of crack cocaine from Trevelle Baylis. During each controlled purchase, Baylis instructed the CI to come to the residence to purchase the crack cocaine from him.

5.      The last controlled purchase was made in the last 48 hours. Prior to the arrival of the CI at the residence, I searched the CI and the CI's vehicle for illegal contraband and found none. While enroute to the residence, I maintained visual surveillance of the CI and the CI's vehicle. Once the CI arrived at the residence, I monitored the transaction with an electronic audio monitoring device. The audio monitored during the transaction was recorded as evidence. After the transaction was completed, the CI left the residence and drove to a pre-arranged meeting location to meet me. While enroute to the meeting location, I maintained visual surveillance of the CI and the CI's vehicle. Upon meeting me, I took custody of the crack cocaine that the CI had just purchase from Trevelle Baylis.

6.      The CI has positively identified Trevelle Baylis as the individual that sold crack cocaine to them by choosing Baylis' photo in a photo lineup.

7.      Trevelle Baylis is known to stay at 130 S. Walker Ln. On

September 24, 2007, Baylis suffered a single gunshot wound during
a home invasion style burglary at the residence. Investigators believe
that the home invasion was the result of an on-going dispute between
Baylis, his brother, Anthony Baylis, and three other individuals over
drug territory.

[Doc. 12-2]

## A.    Confidential Informant

The defendant  faults the affidavit for failing to establish the CI's reliability.  In addressing

the proper analysis for cases involving the use of confidential informants, the United States Court

of Appeals for the Sixth Circuit has provided the following guidance:

> Our cases have identified three categories of informants: (1) named
> informants; (2) confidential informants, who are known to the affiant
> but not to the magistrate; and (3) anonymous informants, who are
> known to no one but the informant.  Whereas naming an informant
> is often, but  not always, an indicator of reliability, 2 WAYNE R.
> LAFAVE, SEARCH AND SEIZURE § 3.3(c) at 136 (4th ed. 2004),
> the police must find other ways to bolster the tips of the other,
> confidential or anonymous, informants.  For instance, we demand
> consideration of an informant's "veracity, reliability, and 'basis of
> knowledge'" when dealing with a confidential informant, as we are
> in this case.  Rodriguez-Suazo, 346 F.3d at 646 (quoting United
> States v. Smith, 182 F.3d 473, 477 (6th Cir. 1999)).  These factors are
> not evaluated independently; rather, the  presence of more of one
> factor makes the others less important.  For instance, the more
> reliable the informant, the less detail the informant must provide in
> his tips before a magistrate can find probable cause.  See Gates, 462
> U.S. at 233.

United States v. Ferguson, 252 Fed. App'x. 714, 720-721 (6th Cir. 2007).  The Sixth Circuit has

further held that in cases involving a confidential informant, such as this one, more is required than

a simple attestation to the reliability of the informant, but instead the law demands

> that an affidavit demonstrate more than simply blind faith in the
> words of an affiant who claims his unnamed informant is reliable.
> For example, in Rodriguez-Suazo, even though the officer's
> confidential informant had provided prior tips that resulted in over

15

three arrests and convictions, the police still conducted some (albeit minimal) corroboration of the tip in question. 346 F.3d at 646-47. Similarly, in United States v. May, 399 F.3d 817 (6th Cir. 2005), we held that the tip of an unnamed confidential informant can support a finding of probable cause when "the issuing judge had before him 'additional evidence [that] buttressed the informant's information.'" 399 F.3d at 824 (quoting United States v. Williams, 224 F.3d 530, 532 (6th Cir. 2000)). One piece of additional evidence that the May court considered was that the informant had provided reliable information in the past, but we also considered the independent corroboration by the police. See also United States v. Williams, 224 F.3d 530, 532-33 (6th Cir. 2000) (finding probable cause from an affidavit that relied on a confidential informant who had previously provided information leading to arrests and convictions, but where the affiant also mentioned his own personal knowledge regarding the sale of drugs at the location to be searched and the affiant separately informed the issuing judge about police surveillance of the residence), cert. denied, 531 U.S. 1095, 121 S. Ct. 821, 148 L. Ed. 2d 704 (2001).

Ferguson, 252 Fed. App'x. at 721.

In the instant case, the affidavit fails to set forth any details as to the history of the CI, other than a minimal statement that the CI had provided some unknown level of assistance to the ORPD and other agencies in the past. [Id. at ¶ 3] No facts are offered to allow the reviewing judge to determine the veracity and reliability of the confidential informant, but instead the reviewing judge must merely accept the officer's word that the confidential informant is reliable, which would result in an improper "ratification of the conclusions of others." Gunter, 2009 WL 37481, at *6. As noted above, in the absence of some detail as to the veracity and reliability of the CI, additional evidence that buttresses the informant's information is needed, and such is provided in this instance through the use of controlled buys.

The Sixth Circuit has held that the independent police corroboration needed in the face of a weak showing as to the veracity of the confidential informant may be established by a police

monitored control buy. United States v. Coffee, 434 F.3d 887, 894 (6th Cir. 2006) (affirming the district court's conclusion that even though there were no statements in the affidavit about the reliability of the confidential informant, the officer's "statements that he set up the controlled buy and took necessary precautions before and after the orchestrated purchase adequately corroborated the CI's information, and thus, provided sufficient probable cause for the issuance of the search warrant"). The Sixth Circuit has further held that

> two controlled purchases were sufficient to corroborate the reliability of a confidential informant despite the fact the informant did not wear a wire during the purchase. United States v. Hawkins, No. 07-3634, 2008 U.S.App. LEXIS 11439, at *17 (6th Cir. May 23, 2008) (concluding that officers took the "necessary precautions before and after the orchestrated purchase adequately corroborated the CI's information and, thus, provided sufficient probable cause for the issuance of the search warrant" (quoting Coffee, 434 F.3d at 894 and citation omitted)). In addition, this court found sufficient independent corroboration where law enforcement officials conducted only one controlled purchase via a listening device. See United States v. Jackson, 470 F.3d 299, 307 (6th Cir. 2006).

United States v. Henry, No. 07-5867, 2008 WL 4691789, at *3 (6th Cir. Oct. 24, 2008).

In the instant case, the affidavit describes the elaborate safeguards taken by the police to ensure that the controlled buy performed in this case would accurately corroborate the CI's information, including audio monitoring of the controlled buy. [Doc. 12-2 at ¶ 5] The Court finds that the safeguards employed by the police were sufficient to corroborate the information provided by the CI, and that, under Jackson, the monitored controlled purchase described in the affidavit was sufficient to make up for the missing details as to the CI's reliability. Thus, although minimal assurance of the reliability of the CI was provided, such weakness was shored up by the strength of the police corroboration demonstrated through the controlled buy. See Henry, 2008 WL 4691789, at *4 n. 4 (holding that when an officer only described a CI as "reliable" and failed to explain the

basis for such a description, probable cause was still provided based on police corroboration through a controlled buy).

**B.      Nexus**

The defendant also challenges the affidavit for failing to establish a nexus between the place to be searched and the criminal activity or contraband sought.  An affidavit offered in support of a search warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items."  United States v. Hawkins, 278 Fed. App'x. 629, 634 (6th Cir. 2008).

In this instance, the affidavit specifically states that the suspect, Trevelle Baylis, "does not live at the residence, but frequents and uses the residence as a location to sell crack cocaine with permission of the resident, Melissa McBee."  [Doc. 12-2 at ¶ 2]  Thus, based on the affidavit, the suspect sold drugs out of the Residence, but there is no indication that drugs are stored at the Residence, and  the affidavit specifically states that the suspected drug dealer, Trevelle Baylis, does not live at the place to be searched, further limiting any basis for assuming that drugs might be found at the Residence during the execution of the Warrant.  Thus, while drugs might be suspected to be found at the Residence when the suspect was present at the Residence, there is no guarantee that Trevaille Baylis would be present when the Warrant was executed.  In the absence of some level of assurance that criminal activity or contraband would be present at the Residence when the Warrant was executed, the Warrant should not have issued.  Zurcher v. The Stanford Daily, 436 U.S. 547, 556-57 n.6 (1978) (superseded on other grounds) ("Search warrants may be issued only by a neutral and detached judicial officer, upon a showing of probable cause – that is, reasonable grounds to believe – that criminally related objects are in the place which the warrant authorizes to be searched,

**at the time when the search is authorized to be conducted**.") (emphasis added); United States v.

McPhearson, 469 F.3d 518, 524 (6th Cir. 2006) ("In other words, the affidavit must suggest 'that

there is reasonable cause to believe that the specific 'things' to be searched for and seized are

located on the property to which entry is sought' and not merely 'that the owner of property is

suspected of crime.'"); United States v. Savoca, 761 F.2d 292, 297 (6th Cir. 1985) ("[A] suspect's

mere presence or arrest at a residence is too insignificant a connection with that residence to

establish that relationship necessary to a finding of probable cause.")

This case is unusual in that the place to be searched is not the residence of the suspected drug

dealer, but is instead a place that the dealer "frequents," though the affidavit offers no details as to

how often Trevelle Baylis visits the Residence, or for what length of time such visits occur. Nor

does the affidavit indicate that the warrant would only be executed while Trevelle Baylis was at the

Residence. Courts have held that "the allegation that [a suspect] is a drug dealer, without more, is

insufficient to tie the alleged criminal activity to the [suspect's] residence." Frazier, 423 F.3d at 533.

In this instance, it is not the suspect's residence at issue, creating an even larger gap between the

location to be searched and the suspected criminal activity. With some assurance that drugs are

likely being stored at a suspect's residence, courts have often found that a search of the dealer's

residence is appropriate. See United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999) (finding that

it was reasonable to suppose that drug dealer stored evidence of dealing at home, even though no

drug trafficking was observed to occur there); United States v. McClellan, 165 F.3d 535, 546 (7th

Cir. 1999)("In issuing a search warrant, a magistrate is entitled to draw reasonable inferences about

where the evidence is likely to be kept . . . and . . . in the case of drug dealers evidence is likely to

be found where the dealers live."); United States v. Henson, 123 F.3d 1226, 1239 (9th Cir. 1997)

("In the case of drug dealers, evidence is likely to be found where the dealers live."); United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994) (ruling that observations of drug trafficking occurring away from the dealer's residence, coupled with officer's statement in his affidavit that drug dealers often store evidence of drug dealing in their residences, provided probable cause for search of dealer's house); United States v. Thomas, 300 U.S. App. D.C. 380, 989 F.2d 1252, 1255 (D.C. Cir. 1993) (per curiam) (concluding that observations of drug trafficking away from dealer's residence can provide probable cause to search the dealer's house); United States v. Williams, 974 F.2d 480, 482 (4th Cir. 1992)(per curiam) (finding that affidavit establishing that known drug dealer resided in motel was sufficient to show probable cause to search motel room for drug paraphernalia); United States v. Davidson, 936 F.2d 856, 859-60 (6th Cir. 1991) (holding that the police had probable cause for the issuance of a search warrant since the affidavit revealed a substantial basis for concluding that a search of the defendant's residence would uncover evidence of wrongdoing); United States v. Cruz, 785 F.2d 399, 406 (2d Cir. 1986) (finding probable cause for search of drug dealer's apartment, even though he was not seen using the apartment). However, in such cases, there is some assurance that contraband or criminal activity will be uncovered when the residence is searched. Such assurance is absent in this case.

Had the affidavit contained some assurance that Trevelle Baylis lived in or stored contraband at the Residence, or some indication of a long term pattern of ongoing criminal activity (a pattern which is missing from the instant affidavit because it fails to describe the number of controlled buys or the time frame over which they were made), or if the execution of the warrant were premised on the presence of Trevelle Baylis, a nexus would exist between the Residence and criminal activity, but such is not the case. Nor does the Court believe that a reasonable inference that drugs or drug

20

activity would be found at the Residence can be based on the affidavit before it. Had the Residence belonged to Trevelle Baylis, such an inference would be appropriate, but, again, that is not the case. The Court does not seek to tie the hands of law enforcement by allowing drug dealers to use the home of a third party to shield their drug activity, but in such an instance, the Court believes that some additional assurance is needed over that provided in the affidavit before the Court.

The government cites to the case of <u>United States v. Harris</u>, 255 F.3d 288 (6th Cir. 2001) arguing that the case involved a a drug dealer, "Fat Boy" selling drugs out of a residence belonging to "John Doe," and that controlled buys at the residence are enough to establish a nexus. However, the affidavit in Harris only mentions one person, "John Doe" who is described as both the resident (or occupier) of the premises and the individual in possession of the drugs to be searched for. <u>Id.</u> at 290. The affidavit makes no mention of Fat Boy, and certainly in no way indicates that the resident and the suspected drug dealer were two different people. <u>Harris</u> therefore offers no guidance as to the issues before the Court, because it appears the dealer and the home owner were the one and the same.

Numerous cases address the propriety of an inference that a drug dealer stores drugs in his own home. However, there have been no cases cited to the Court, nor is the Court aware of any, that permit an inference that a drug dealer might store drugs in the residence of a third party when the drug dealer is only shown to sell drugs at the third party residence. The distinction, while subtle, is significant, for while courts have held that it is natural to assume that a drug dealer stores drugs in his own home, that same inference necessarily means that it would be unreasonable to assume Trevelle Baylis stores drugs at the Residence in the absence of some proof to the contrary. Rather, the natural inference would be that Trevelle Baylis stores drugs in his own home, not the Residence.

Absent such an inference, and absent any evidence that Trevelle Baylis actually kept or stored any drugs at the Residence, there is no nexus between the place to be searched and the criminal activity or contraband to be sought, and thus the Court finds that the affidavit fails to meet the requirements necessary for a showing of probable cause.

### C.     Misrepresentations

The defendant also argues that the affidavit contains material misrepresentations, and thus can not support a finding of probable cause.  Specifically, the defendant argues that the affidavit's statement that Ms. McBee knew of the existence of the alleged criminal activity and the statement that Trevelle Baylis is known to "stay" at the Residence are false statements intentionally included in the affidavit in an attempt to ensure that the warrant would issue. "[A] search warrant must be voided and the fruits of the search excluded if a defendant shows by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

In this instance, after considering the testimony of Officer Moore, the Court does not find that the statements in question were knowingly and intentionally false or that they were made with a reckless disregard for the truth.  With respect to the statement regarding Ms. McBee's knowledge of the criminal activity, a position which Officer Moore rejected only after having the opportunity to question Ms. McBee after the search, the Court finds that, at the time of the warrant application, the statement was true to the best of Officer Moore's knowledge.  The fact that the CI was mistaken does not equate to a finding that Officer Moore intentionally or recklessly misled the issuing judge, and it is only intentional or reckless behavior that Franks is designed to guard against.  The Court

22

finds that at the time of the application, Officer Moore believed the CI, and thus the statement was not knowingly nor recklessly false.

With respect to the second statement, that Trevelle Baylis was "known to stay" at the Residence, given the earlier, explicit statement in the affidavit that Trevelle Baylis "does not live at the residence, but frequents and uses the residence" [Doc. 12-2 at ¶ 2], the Court does not find that the statement in question was offered in an attempt to mislead the issuing judge, but instead was intended to again convey the idea that Trevelle Baylis frequented the Residence. While the Court finds Officer Moore's choice of wording somewhat unfortunate, the Court does not find that such wording to be false nor to rise to an intentional or reckless disregard for the truth.

### D. Leon Good Faith Exception

Having found that the Warrant was not supported by probable cause because of the lack of a nexus between the place to be searched and the criminal activity or contraband sought, the Court must next determine whether the good faith exception established by United States v. Leon, 468 U.S. 897 (1984), applies to shield the evidence in question from suppression. In Leon, the United States Supreme Court held that the exclusionary rule should not bar "admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." Leon, 468 U.S. at 905. The relevant inquiry is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 922 n. 23.

Leon established four situations in which an officer's reliance on a subsequently invalidated warrant could not be considered to be objectively reasonable: (1) when the search warrant is issued on the basis of an affidavit that the affiant knows, or is reckless in not knowing, contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as

a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable, or where the warrant application was supported by nothing more than a "bare bones" affidavit; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. See United States v. Washington, 380 F.3d 236, 241 (6th Cir. 2004).

In this instance, the Court finds that the first situation, a knowingly or recklessly false affidavit, does not apply. As the Court found above, the affidavit in this case does not contain knowing or reckless falsehoods, nor does the Court find that the Warrant was issued based on that information. Nor is there any evidence of, and the Court does not find that, the state judge in this case served as a mere rubber stamp for police activity.

As for the remaining two factors, the Court finds that they do not apply in this case. While the Court finds that the affidavit does not contain the details necessary to establish probable cause, it is not so "bare bones" as to fall outside the good faith exception. The standard for determining whether an affidavit is "so lacking in indicia of probable cause" as to render a belief in its existence unreasonable is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place. United States v. Carpenter, 360 F.3d 591, 595 (6th Cir. 2004). "Thus, it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance." Washington, 380 F.3d at 241. A "bare bones" affidavit "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." United States v. Van Shutters, 163 F.3d 331, 337 (6th Cir. 1998). In this instance, the affidavit does provide substantial factual information, such as the fact that the CI has assisted law enforcement, is participating in on-going investigations,

24

and was able to make at least one controlled purchase at the Residence within the 48 hours preceding the issuance of the Warrant. In addition, the fact that the affidavit indicates that controlled buys from Trevelle Baylis were made at the Residence, and that Trevelle Baylis was injured during a drug related home invasion of the Residence does show that police investigation, confirmation, and corroboration was performed, offering further evidence against a finding of "bare bones." While the Court does not find that these factors were sufficient to establish probable cause, the Court believes that the affidavit is sufficient that a reasonably well trained officer would have believed the Warrant was valid.

In addition, the Court notes that the question of probable cause in this matter is a very close question. The Court is unaware of any jurisprudence directly addressing the unique situation before the Court, nor have the parties cited any. Given the difficulties the Court faced in addressing this issue, the Court finds that a law enforcement officer simply could not be expected to appreciate the unique problems raised by the scenario at issue. To rule otherwise would require law enforcement to also serve as legal scholars, and such is not the goal of Leon.

Accordingly, the Court finds that while the affidavit was not supported by probable cause, the Leon good faith exception does serve to protect the evidence obtained from suppression. Therefore, the Court recommends that Defendant's motion to suppress evidence [Doc. 8] be **DENIED**.

### E. Statements by the Defendant

Defendant also argues that any statements made by him during the execution of the Warrant should also be suppressed because the officer failed to read him his Miranda rights before the statement was made. The government argues that the public safety exception to Miranda applies to

this case, thus preserving the statements from suppression.

The Sixth Circuit has described the interplay between a defendant's <u>Miranda</u> rights and the

public safety exception as follows:

> Under the familiar rule of <u>Miranda v. Arizona</u>, "the prosecution may
> not use statements, whether exculpatory or inculpatory, stemming
> from custodial interrogation of the defendant unless it demonstrates
> the use of procedural safeguards effective to secure the privilege
> against self-incrimination." 384 U.S. 436, 444 (1966). However,
> when officers ask "questions necessary to secure their own safety or
> the safety of the public" as opposed to "questions designed solely to
> elicit testimonial evidence from a suspect," they do not need to
> provide the warnings required by <u>Miranda</u>. <u>New York v. Quarles</u>,
> 467 U.S. 649, 659 (1984).

<u>United States v. Williams</u>, 483 F.3d 425, 428 (6th Cir. 2007). The Sixth Circuit has further held that

the public safety exception

> applies "when officers have a reasonable belief based on articulable
> facts that they are in danger." <u>Williams</u>, 483 F.3d at 428 (quoting
> <u>United States v. Talley</u>, 275 F.3d 560, 563 (6th Cir. 2001)).
>
> In <u>Williams</u>, we set forth the standard the government must satisfy in
> order for custodial statements, made prior to the issuance of any
> <u>Miranda</u> warnings, to be admissible under the <u>Quarles</u> public safety
> exception. "For an officer to have a reasonable belief that he is in
> danger," and thus for the exception to apply, "he must have reason to
> believe (1) that the defendant might have (or recently have had) a
> weapon, and (2) that someone other than police might gain access to
> that weapon and inflict harm with it." <u>Id.</u> at 428. We explained
> further that the public safety exception applies "if and only if" each
> of these two conditions is met. <u>Id.</u>

<u>United States v. Glenn Williams</u>, No. 06-4134, 2008 U.S. App. LEXIS 7724, at *10-11 (6th Cir.

April 4, 2008).

There is no doubt that Defendant was effectively in police custody when Officer West

ordered Defendant to the ground and handcuffed him, thus the subsequent inquiry by Officer West

as to whether Defendant was armed was a custodial interrogation.  The evidence further shows that

Defendant was not Mirandized prior to the questioning.  [Tr. 11]  However, after considering the

evidence of record, the Court finds that both of the requisite elements of the public safety exception

have been met.  Officer West testified at the hearing that the officers executing the Warrant were

told that they would be looking for drugs, that individuals at the Residence might be armed, and that

the Residence had recently been the location of a home invasion, in which someone had been shot.

[Tr. 5] Thus, the Court finds that it was reasonable for Officer West to believe that Defendant might

be armed and to fear that someone might be injured if Officer West did not act to protect against

such harm.  The fact that Defendant was in handcuffs at the time of the questioning does not alter

the analysis, as the "Quarles public safety exception . . . has long permitted questions posed to a

defendant in handcuffs."  United States v. Glenn Williams, 2008 U.S. App. LEXIS 7724, at *12.

Accordingly, the Court finds that although Defendant was not Mirandized before being

questioned by Officer West, the limited questioning falls within the Quarles public safety exception,

and thus Defendant's answer should not be suppressed.  Therefore, the Court recommends that

Defendant's motion to suppress statement [Doc. 10] should be **DENIED**.

## V.      CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Anthony

Cornelius Baylis' Motion to Suppress Evidence [Doc. 8] and Motion to Suppress Statement [Doc.

10] should be **DENIED**.[2]

Respectfully submitted,


    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).